UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THERMO NITON ANALYZERS LLC,

　　　　　　Plaintiff,

　　　v.

INNOV-X SYSTEMS, INC.,

　　　　　　Defendant.

Civil Action No. 09-12053

**DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. i

INTRODUCTION ...........................................................................................1

BACKGROUND ............................................................................................3

 I. Innov-X's Business.................................................................3

 II. Innov-X Created an Accurate PowerPoint Based on Niton's
  Own User Manual ...............................................................3

 III. Several Factors Indicated that Niton's Original Published Data
  Were Reliable.......................................................................4

 IV. The Day After Receiving an Updated Manual, Innov-X Instructed
  Its Sales Force Not to Use Data from the Original Niton Manual.................5

 V. Innov-X Did Not Create or Distribute the Documents Appended
  to Niton's Motion.................................................................6

 VI. Innov-X Again Instructed its Sales Force Not to Use the
  Original Niton Manual ...........................................................8

ARGUMENT ...............................................................................................8

 I. Niton Cannot Show a Clear Likelihood of Success on Any of Its Claims .....9

 A. Niton Cannot Show a Clear Likelihood of Success on Its Lanham
  Act Claim ..........................................................................9

 1. Innov-X Did Not Make a False or Misleading Description or
  Representation in A Commercial Advertisement ...........................9

 a. Innov-X's Statements About Niton's Published Radiation Data
  Were True.........................................................................10

 b. Niton's Vague Allegations About Statements from 2007 or 2008 are
  Unsupported, and in Any Event, Barred by the Doctrine of Laches ............11

 c. The Statements that Niton Identifies Were Not Made by Innov-X .............12

 2. Niton Cannot Demonstrate Materiality.........................................13

 3. Niton Has Provided No Evidence of Consumer Deception..........................14

4.      Niton Cannot Demonstrate Harm from the Accused Statements .................14

II.     Niton Cannot Demonstrate a Clear Likelihood of Success on Its State
        Law Claims ........................................................................................................15

III.    Niton Cannot Demonstrate Irreparable Harm Absent an Injunction ............16

IV.     The Balance of Harms and Public Interest Favor Denying the Motion ........18

V.      Niton's Unclean Hands Preclude a Preliminary Injunction ..........................19

CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Bd. of Psych. & Neur., Inc. v. Johnson-Powell*,
129 F.3d 1 (1st Cir. 1997)................................................................17

*Better Bus. Bureau of Met. Houston, Inc. v. Med. Directors, Inc.*,
681 F.2d 397 (5th Cir. 1982) ..........................................................19

*Borden, Inc. v. Kraft, Inc.*,
1984 WL 1458 (N.D. Ill. Sept. 28, 1984) ........................................19

*Charter Envt'l, Inc. v. Shaw Envt'l, Inc.*,
2009 WL 2982772 (D. Mass. Sept. 14, 2009) ....................................1

*Clorox Co. of Puerto Rico v. Procter & Gamble*,
228 F.3d 24 (2000)..................................................................... passim

*Converse Inc. v. Reebok Int'l, Inc.*,
328 F. Supp. 2d 166 ............................................................................1

*Dulgarian v. Stone*,
420 Mass. 843 (Mass. 1995) ............................................................16

*Gillette Co. v. Norelco Cons. Prods. Co.*,
946 F. Supp. 115 (D. Mass. 1996) ...................................................15

*Hearst Business Publ'g, Inc. v. W.G. Nichols, Inc.*,
76 F. Supp. 2d 459 (S.D.N.Y. 1999)................................................11

*J. Fritz, DMA, Inc. v. Arthur D. Little, Inc.*,
944 F. Supp. 95 (D. Mass. 1996) .....................................................18

*Jalbert v. Grautski*,
2009 WL 3754698 (D. Mass. Feb. 12, 2009) .....................................1

*Korpacz v. Women's Prof'l Football League*,
2006 WL 220762 (D. Mass. Jan. 27, 2006) ......................................15

*New Comm. Wireless Servs., Inc. v. SpringCom, Inc.*,
287 F.3d 1 (1st Cir. 2002)....................................................... 9, 16, 18

*Picker Int'l v. Leavitt*,
865 F. Supp. 951 (D. Mass. 1994) ...................................................16

*Sorenson v. H&R Block, Inc.*,
    107 Fed. Appx. 227 (1st Cir. 2004) .......................................................................13

*Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.*,
    198 F. Supp. 2d 59 (D. Mass. 2002) ....................................................................10

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Aff.*,
    60 F.3d 867 (1st Cir. 1995)..................................................................................20

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    793 F.2d 1034 (9th Cir. 1986) .............................................................................19

## OTHER AUTHORITIES

21 C.F.R. §§ 1000-1005, 1010.................................................................................4

D. Mass. Local Rule 7.1(a)(2) ................................................................................1

D. Mass. Local Rule 7.1(b)(4) ................................................................................1

## INTRODUCTION

Thermo Niton Analyzers LLC ("Niton") asserts in its Motion for Preliminary Injunction ("PI Motion") [1] that Innov-X Systems, Inc. ("Innov-X") "brazenly exaggerated the radiation dose rates of Thermo Niton's analyzers by multiplying the published dose rates by one hundred" – *i.e.*, that Innov-X effectively "whited out" the numbers Niton published in its user manual and replaced them with fake numbers 100 times higher. PI Mem. 21. An act like that would have been brazen – if it had happened. It did not.

Niton failed to meet and confer with Innov-X as required by Local Rule 7.1(a)(2) before filing its PI Motion and Motion for Expedited Hearing; the Court should deny the PI Motion on that basis alone. [2] If Niton had bothered to confer with Innov-X, it would have learned that its PI Motion is based false factual premises and is moot for three reasons: (1) the only statements Innov-X has made regarding Niton's analyzers' radiation exposure levels were true and accurate citations of data from *Niton's own published user manual*; (2) upon learning that Niton had released a new version of its user manual with different radiation exposure figures, *more than a year ago*, in early November 2008, Innov-X's CEO immediately instructed employees and sales representatives stop using comparative radiation information based on the previous version of

---

[1]    Plaintiff's Motion for Preliminary Injunction and Memorandum in Support are collectively referred to as "PI Motion." All cites to "PI Mem." are to the Memorandum in Support.

[2]    Niton's failure to comply with Local Rule 7.1(a)(2) is itself sufficient reason to deny Niton's PI Motion. Niton's failure to meet and confer on the present motion is significant because Niton's motion is based on an inaccurate factual premise that Niton, if it were previously unaware of the inaccuracy, would have discovered had it conferred pursuant to Local Rule 7.1(a)(2). Where, as here, a party's failure to comply with Local Rule 7.1(a)(2) leads to a waste of resources, courts typically deny the motion as not properly before the court, and/or impose sanctions such as awarding the non-moving party's attorneys' fees associated with opposing the motion. *See, e.g.*, *Charter Envt'l, Inc. v. Shaw Envt'l, Inc.*, 2009 WL 2982772 at *16 (D. Mass. Sept. 14, 2009);; *see also Converse Inc. v. Reebok Int'l, Inc.*, 328 F. Supp. 2d 166, 70-71 (imposing $15,000 sanctions where a party failed to confer pursuant to Local Rule 7.1 prior to filing its motion); *Jalbert v. Grautski*, 2009 WL 3754698, at *3 (D. Mass. Feb. 12, 2009) (stating that "Local Rule 7.1 cannot simply be ignored" and reducing the defendant's attorney's fees award to reflect the additional costs resulting from his failure to confer").

In another instance of flouting the Local Rules, Niton filed without leave of court a memorandum in support of its PI Motion that exceeds the page limit by five pages. *See* Local Rule 7.1(b)(4).

Niton's user manual; and (3) none of the printed materials upon which Niton bases its claims were drafted or distributed by Innov-X.[3]

Innov-X wrote to Niton on December 9, 2009, attaching the Niton XLt3 user manual that it had accurately cited. Innov-X informed Niton that it had stopped using data based on that user manual, and asked Niton to withdraw its complaint and PI Motion because they are based on false factual allegations. Declaration of Robert D. Carroll ("Carroll Dec.") Ex. A. Without contending that its allegations of "brazen . . . multipli[cation] of published dose rates by one hundred" and "literally false statements" are actually accurate, Niton responded simply that it "has no intention of either dismissing its Complaint or withdrawing its Motion for a Preliminary Injunction." *Id.* Ex. B. Niton's filing of the Complaint and PI Motion and proceeding with knowledge that they are based on false allegations constitutes unclean hands and bars the issuance of a preliminary injunction.

The relief that Niton actually seeks sheds light on its potential motive. Niton's proposed injunctive order does not seek to enjoin Innov-X from stating that Niton's user manual states radiation emission levels other than those that the user manual actually states (the act that Niton falsely accuses Innov-X of taking). Instead, Niton asks the Court to enjoin Innov-X from making *any statement* – even if true – that "Thermo Niton's analyzers expose users to radiation dose rates *inconsistent with those reported in Thermo Niton's published literature*" or that "Thermo Niton's analyzers are unsafe, dangerous, and/or expose users to unsafe levels of radiation." PI Order (Dkt. No. 4, Ex. 1). (emphasis added). In other words, Niton asks the Court to enjoin Innov-X indefinitely from challenging anything that Niton says about its own products radiation levels, without regard to whether Niton's statements are accurate. Such an order would

---

[3]    Innov-X reserves all defenses and counterclaims, including those not discussed in this opposition.

turn the Lanham Act on its head, and violate the public interest and the First Amendment.

## BACKGROUND

I.    **Innov-X's Business.**

Innov-X designs, manufactures, and sells, *inter alia*, x-ray fluorescence ("XRF") analysis tools, including portable XRF analyzers.  Declaration of Donald Sackett ("Sackett Dec.") ¶ 4. Innov-X sells its portable XRF analyzers through Innov-X sales representatives and independent distributors worldwide.  *Id.* ¶ 5.

II.    **Innov-X Created an Accurate PowerPoint Based on Niton's Own User Manual.**

In or around August 2008, a Niton customer gave Innov-X a copy of a published, "NITON XL3t 800 Series Analyzer User's Guide" ("Original Niton Manual"), which Niton distributed to potential customers and purchasers of the Niton XL3t 800 series analyzer, which Niton began selling in 2007 and continues to sell today. Sackett Dec. ¶ 6; *id.* Ex. A (Original Niton Manual).[4]  This was the only XL3t user manual Innov-X was aware of at the time.  *Id.*

In or around September 2008, Innov-X's CEO, Don Sackett, used the Original Niton Manual to create a PowerPoint document ("PowerPoint") that includes unadulterated versions of two of the four slides referenced in the Complaint, PI Motion, and Yuen Affidavit, among other slides.  Sackett Dec. ¶ 9; *id.* Ex. B (PowerPoint).  In the Presentation, prior to presenting any data regarding Niton's XL3t 800 series analyzer, Innov-X clearly stated, in bold print, that the comparison done in the PowerPoint was based on data "**from manufacturer's published data or User Manual**."  *Id.* at 2 (emphasis original).  In the PowerPoint, Innov-X lists the radiation exposure levels for Niton's XL3t analyzer *at the exact levels* of mRem/hr that Niton lists on Table 3-7 of the Original Niton Manual.  *Compare* Sackett Dec. Ex. B at 3-5 (PowerPoint) *with*

---

[4]    The Original Niton Manual is for "Version Beta" of the Niton XL3t 800 series analyzer.  Niton press releases show that it was distributing the XL3t 800 series analyzer "Version Beta" to customers by spring 2007. Carroll Dec. Ex. F.

*id.* Ex. A at Table 3-7 (Original Niton Manual). The PowerPoint disclosed that it was presenting

data from Niton's user manual, and accurately presented the data from that manual.

Dr. Sackett sent the PowerPoint by e-mail to Innov-X sales managers and sales

consultants on September 29, 2008. Sackett Dec. ¶ 11; *id.* Ex. B. Sackett stated that sales

managers should "present[] this material so as to appear credible, without selling fear." *Id.* He

suggested noting "that both instruments are relatively safe if used properly, although it is fair to

note that for the Niton, the dose to the operator's hand is quite high for plastics and soils/ores if

the instrument is used at reasonable duty cycles" and could lead to radiation doses in excess of

the annual allowed dose, which should be a cause for concern. *Id.* Dr. Sackett also stated that he

had "found that nobody ever seems to bother to look up the radiation profiles [of XRF analyzers]

and think about the ramifications," and that "[i]t is our duty to show both sets of numbers to

prospects, *as both sets are from the manufacturer's publications,* and are fair game." *Id.*

(emphasis added). The sales managers who received the PowerPoint forwarded it to some

Innov-X sales staff and some of the independent distributors who purchase and resell Innov-X

products. Sackett Dec. ¶ 16.

**III.    Several Factors Indicated that Niton's Original Published Data Were Reliable.**

Several factors led Innov-X to rely on the radiation emission data that Niton published in

the Original Niton Manual. Foremost among these is that manufacturers of products that expose

users to radiation are required to make filings to the U.S. Food & Drug Administration (FDA)

and state agencies certifying that their products' radiation levels meet relevant safety standards.

Sackett Dec. ¶¶ 18-19; *see also* 21 C.F.R. §§ 1000-1005, 1010. Accordingly, the radiation

emission numbers that manufacturers of radiation emitting products certify to the FDA and state

agencies and publish in their user manuals are generally subject to rigorous testing and internal

peer review.  Sackett Dec. ¶ 21.  It is standard industry practice to rely on the radiation data stated in manufacturers' published manuals.  *Id.* ¶ 22.

Second, the radiation numbers reported in Niton's Original User Manual were also credible to Innov-X because Innov-X had previously performed rough comparisons of radiation emission levels between its XRF analyzer and Niton's XL3t using a Geiger counter in which the Niton products radiation emissions registered at many multiples of those of the Innov-X product. Sackett Dec. ¶¶ 23-24 *see also id* Ex. C (11/6/08 e-mail) (comparisons with a Geiger counter "showed 10X or more intensity of x-rays from the xlt3 than from our unit").

Finally, it also made sense that Niton's XL3t analyzer would emit higher radiation levels than Innov-X's handheld analyzer as a scientific principle.  Niton's XL3t analyzer contains a 50 kV x-ray tube.  Innov-X's largest handheld analyzers, the Alpha and Omega series, contain a 40 kV x-ray tube.  *Id.* ¶ 29.  It is a law of physics that x-rays emitted between 40 kV and 50 kV (which are created by a 50 kV x-ray tube) are substantially more penetrating than the x-rays created up to 40 kV by a 40 kV x-ray tube.  Therefore, with the same amount and type of shielding, the x-ray emissions from a 50 kV tube will be significantly higher than those from a 40 kV tube.  *Id.* ¶ 30.  While Dr. Sackett expressed surprise in September 2008 that "Niton would put a product onto the market with these radiation levels," there were several reasons why he believed that Niton's published data were reliable.  Sackett Dec. Ex. B (9/29/08 e-mail). Sackett also the data to his technical staff, who believed that they were reliable.  *Id. ¶* 27.

## IV.    The Day After Receiving an Updated Manual, Innov-X Instructed Its Sales Force Not to Use Data from the Original Niton Manual.

The *next day* after it received an updated Niton user manual, on November 5, 2008, Innov-X instructed its employees and sales representatives, and requested that its independent distributors, not to use the data Niton had published in the Original Niton Manual.

In mid-October 2008, Dr. Sackett received a copy of the Niton XL3t QuickStart Guide Version 6.0 ("Niton QuickStart 6.0"). Sackett Dec. ¶ 32. The Niton Quickstart 6.0 guide did not contain "Table 3-7," the table that Innov-X had cited in its Presentation. After realizing that the Niton QuickStart 6.0 contained some radiation emissions data that varied from the data contained in the Original Niton Manual, Innov-X attempted to determine which numbers were correct, and whether Niton had published an updated user manual. *Id.*

On November 5, 2008, Dr. Sackett received a copy of a newer version of the Niton Manual, Version 6.0 ("Niton Manual 6.0"). *Id.* ¶ 33. Upon recognizing that the numbers in Table 3-7 of the Niton Manual 6.0 were 100 times lower than in the Original Niton Manual, *the next day*, on November 6, 2008, Sackett told employees to "hold off distributing the direct radiation comparisons we've assembled between our unit and Niton for awhile." Sackett Dec. Ex. C (11/6/08 e-mail). Dr. Sackett stated in his email that the reduction in radiation levels by a factor of 100 in the Niton Manual 6.0 was a "very suspicious change." *Id.* He noted that the numbers in the Niton Manual 6.0 suggest that Niton's analyzer had lower radiation than Innov-X's, but "[w]e know for a fact that Niton levels, when measured, are at least 10x higher than our levels. So something just doesn't make sense here." *Id.* Nonetheless, Sackett stated that "given they have published new data – regardless how suspicious it is, we should avoid sending out quantitative comparisons." *Id.*

**V.    Innov-X Did Not Create or Distribute the Documents Appended to Niton's Motion.**

Innov-X did not create the documents that are the basis for Niton's PI Motion. To the best of Innov-X's knowledge, no Innov-X employee was involved in drafting or distributing the materials that Niton asserts were distributed in Asia, or had even seen the accused materials prior to Niton's filing of the Complaint and PI Motion. Sackett Dec. ¶ 51.

6

Niton alleges that the documents it accuses of containing false statements were distributed by three Asian companies, JEOL DATUM Ltd. ("JEOL"), WellTechtron, and WinWinMax Electronic Technology Trade Inc. ("WinWinMax"). Yuen Aff. ¶¶ 7-11; Wopperer Aff. ¶ 13; Shein Aff ¶ 23. Two of the distributors that Niton alleges were the source of the accused documents are independent distributors with whom Innov-X had non-exclusive distribution agreements in Japan (JEOL) and China and Hong Kong (WellTechtron). *See* Sackett Dec. Ex. D (JEOL Agreement); *id.* Ex. E (WellTechtron Agreement). Innov-X does not contract with or interact with WinWinMax, but WinWinMax may be an affiliate of TechMax Technical Co. Ltd. ("TechMax"), an independent distributor who resells Innov-X products in China and Taiwan. Sackett Dec. ¶¶ 40-42; *id.* Ex. F (TechMax Agreement).[5]

JEOL, WellTechtron, and TechMax are independent companies that have entered non-exclusive distribution agreements with Innov-X pursuant to which they purchase Innov-X products and resell them to Innov-X customers. Sackett Dec. ¶ 43. Innov-X's distribution agreements with JEOL, WellTechtron and TechMax expressly provide that the agreements do not create an agency relationship between the companies or any of their employees, and that the distributor is not authorized to represent Innov-X or form any agreements on Innov-X's behalf.[6]

---

[5] Niton's allegation that "Innov-X sells its portable analyzers in China through a distributor called WinWinMax Electronic Technology Trade Inc. ("WinWinMax") in Shanghai," Cplt. ¶ 50, is inaccurate. The document labeled "WinWinMax" that Niton attached to its motion contains a footer that says "Copyright © TechMax Technical Co., Ltd. All rights reserved." Blute Aff., Ex. B. The document contains no information as to what affiliation, if any, exists between TechMax and WinWinMax.

[6] *See* Sackett Dec. Ex. D (JEOL Agreement ) Art. 3(1) ("Relationship between [Innov-X] and [JEOL] hereunder is the independent vender and purchaser, and [JEOL] is not considered to be a person who is employed, an agent or a proxy of [Innov-X]."); *id.* Art. 3(2) ("Either [Innov-X] or [JEOL] without prior written consent shall not make any intention, guarantee, or promise to a third party which binds on either [Innov-X], or [JEOL]."); *id.* Ex. E ¶ 9 (WellTechtron Agreement) ("[WellTechtron] is acting as an independent representative and not an employee or agent of [Innov-X]."); *id.* ¶ 17 ("[WellTechtron] shall, in all matters related to this agreement, act as an independent contractor. In all such matters, neither principals nor employees of [WellTechtron] is or shall act as an employee of Innov-X systems."); *id.* Ex. F ¶ 9 (TechMax Agreement) ("[TechMax] is acting as an independent representative and not an employee or agent of [Innov-X]."); *id.* ¶ 17 ("[TechMax] shall, in all matters related to this agreement, act as an independent contractor. In all such matters, neither principals nor employees of [TechMax] is or shall act as an employee of Innov-X systems.").

Although Innov-X provides distributors with marketing materials from time to time, distributors are not required to use marketing materials that Innov-X provides.  Sackett Dec. ¶ 45; *see also, e.g.*, Sackett Dec. Ex. D, Art. 17 (JEOL Agreement).  As independent contractors, JEOL, WellTechtron and Techmax have discretion to develop their own materials to market Innov-X products.  Sackett Dec. ¶ 46. [7]  Innov-X does not have a right to, and does not, control the advertising and marketing activities on JEOL, WellTechtron, or TechMax.  *Id.* ¶ 47.  Innov-X does not have a right to, and does not, direct the activities of any employee of JEOL, WellTechtron, or TechMax.  *Id.* ¶ 48.

## VI.    Innov-X Again Instructed its Sales Force Not to Use the Original Niton Manual.

Niton served Innov-X with the Complaint and PI Motion on December 4, 2009.  This was the first notice that Innov-X received that Niton believed that the statements in or derived from Innov-X's PowerPoint were inaccurate.  *Id.* ¶ 50.  After reviewing Niton's Complaint, the "Version 6.5" of the XL3t user manual attached thereto ("Niton Manual 6.5"), and the PI Motion, Innov-X, through Dr. Sackett, again instructed its sales force to cease using or relying on the comparative radiation level information that was based on the Original Niton Manual. Sackett Dec. Ex. 6 (12/6/09 e-mail).  During a trip to Asia in December 2009, Dr. Sackett had separate in person meetings with representatives from JEOL and WellTechtron in which he repeated the request that they not use data from the Original Niton Manual.  Sackett Dec. ¶ 54.

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (2d ed.).  To obtain a preliminary injunction, Niton

---

[7]        The JEOL Agreement, for example, states that JEOL will "make utmost efforts to promote sales of product through sufficient marketing research and the advertisement *at its own expenses and responsibility*."  JEOL Agreement, Sackett Dec. Ex. D at Art. 17.

must prove, by a clear showing, that (1) it is likely to succeed on its underlying claims; (2) it will suffer irreparable harm if the injunction is not issued; (3) the balance of harms favors the injunction; and (4) the injunction is in – or at least not contrary to – the public interest. *New Comm. Wireless Servs., Inc. v. SpringCom, Inc*., 287 F.3d 1, 8-9 (1st Cir. 2002).

I.    **Niton Cannot Show a Clear Likelihood of Success on Any of Its Claims.**

Because each of Niton's claims requires a showing of false, deceptive, or improper statements, conduct, motive, or means, and Innov-X made only true statements in good faith, Niton cannot show a likelihood of success on any claim, and its PI Motion fails.

A.    **Niton Cannot Show a Clear Likelihood of Success on Its Lanham Act Claim.**

A proponent of a Lanham Act false advertising claim must prove that: (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation. *Clorox Co. of Puerto Rico v. Procter & Gamble*, 228 F.3d 24, 33 n.6 (2000). Reserving Innov-X's arguments with respect to the remaining element, there are at least four elements upon which Niton cannot show a likelihood of success on the merits, each of which independently defeats the PI Motion.

1.    **Innov-X Did Not Make a False or Misleading Description or Representation in a Commercial Advertisement.**

Niton cannot prove that Innov-X made a "false or misleading description of fact or representation of fact in a commercial advertisement," because Innov-X made only true statements. *Id.* at 310. Niton points to three documents as the basis for its claim, which it

9

alleges were distributed by the Asian companies JEOL, WellTechtron and WinWinMax. The only relevant statements that *Innov-X* made were all true and accurate citations to Niton's own published radiation emissions data. The documents that Niton attributes to JEOL, WellTechtron and WinWinMax – which also appear to be based on, and in several instances cite to the Original Niton Manual and are therefore also literally true – were not drafted or distributed by Innov-X. If Niton objects to documents it alleges JEOL, WellTechtron and WinWinMax distributed, then it has sued the wrong defendant.

> **a.    Innov-X's Statements About Niton's Published Radiation Data Were True.**

Niton's Lanham Act claim relies solely on the assertion that Innov-X made "literally false" statements.[8] Where, as here, "the plaintiff *fails* to show that the statement is likely to be found literally false, that . . . will end the analysis when no other basis for the injunction is asserted." *Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.*, 198 F. Supp. 2d 59 (D. Mass. 2002). Niton's "literal falsity" argument fails because Innov-X's accurate citation to and recitation of data from the Original Niton Manual were literally true.

In order to evaluate whether an advertisement is literally false, a court must first identify what the claim is, and then determine whether it is false. *Spalding,* 198 F. Supp. 2d at 65. As discussed above, the only relevant statements made by *Innov-X* were the statements in its Presentation. In the PowerPoint, Innov-X stated that, based on data "from manufacturer's published data or User Manual," the Niton XL3t delivered dose rates that were higher than the Innov-X XRF dose rates and that, in some modes, depending on amount of usage, may exceed the annual allowed dose of 50R/year. *See* Presentation, Sackett Dec. Ex. B at 2-3. These statements are all literally true. All of the Niton XL3t dose rates listed in the PowerPoint are

---

[8]    *See, e.g.*, PI Memo at 13 ("Innov-X has reported radiation dose rates for Thermo Niton's Analyzers that are one hundred times (100x) higher than the actual measured and reported dose rates. Finally, Innov-X has falsely ascribed the source of these inflated dose rates to Thermo Niton's own User's Manual.").

identical to those listed in the Original Niton Manual.  Sackett Dec. ¶ 13.  On Table 3-7 of the

Original Niton Manual, Niton lists the radiation exposure levels for its XL3t analyzer at the exact

levels of mRem/hr that are cited in the Innov-X PowerPoint as well as in the materials apparently

created by third parties that are attached to the PI Motion. [9]  The Niton dose rates listed in the

PowerPoint and Original Niton Manual do exceed the Innov-X XRF dose rates and could,

depending on usage and material being tested, exceed the annual allowed dose of 50R.  *Id.* ¶ 14.

Innov-X explicitly disclosed that it was presenting information from Niton's user manual,

and then accurately presented the information from that manual.  Therefore, each statement in

the PowerPoint concerning XL3t radiation exposure levels that Niton alleges is a false statement

is actually a true statement – *i.e.*, each is an accurate statement of what Niton's *own user manual*

*stated about the XL3t's radiation levels*.  Here, Niton accuses Innov-X of taking its manual and

essentially "whiting out" numbers in Table 3-7, inserting new, false numbers 100 times higher

than the numbers in the manual, and claiming that these numbers came from Niton's manual.

Had Innov-X done so, its statements would have been false.[10]  That is not what happened.[11]

> **b.    Niton's Vague Allegations About Statements from 2007 or 2008 are Unsupported, and in Any Event, Barred by the Doctrine of Laches.**

In addition to its primary claims based on the Asian documents, Niton also makes vague

---

[9]    *Compare* Original Niton Manual, Sackett Dec. Ex. A at Table 3-7 (listing 200 mrem/hr radiation generated by the Niton XL3t at the trigger location B when analyzing plastics) *with* PowerPoint, Sackett Dec. Ex. B at 3 (same) *with* Yuen Aff. Ex. A at 2 (same) *with* Wopperer Aff. Ex. B at 4 (same); *compare* Original Niton Manual, Sackett Dec. Ex. A at Table 3-7 (listing 1 mrem/hr radiation generated by the Niton XL3t at the trigger location B when analyzing stainless alloy samples) *with* Shein Aff. Ex. A at 3 (same).

[10]    *Cf. Hearst Business Publ'g, Inc. v. W.G. Nichols, Inc.,* 76 F. Supp. 2d 459, 469 (S.D.N.Y. 1999) (holding that distribution of advertising that quoted from competitor's literature but deleted the word "not" from the quote to change the meaning was "literally false").

[11]    In its Complaint and PI Motion, Niton claimed that Innov-X made statements that were literally false.  As Innov-X has demonstrated, in light of the existence of the Original Niton Manual – a fact omitted from Niton's Complaint and PI papers – it cannot succeed on such a claim.  To the extent it wishes to pursue a claim that Innov-X made statements that were "misleading," it is required to produce extrinsic evidence that customers were misled. *Clorox Co.*, 228 F.3d at 32.  Niton has not produced a single survey or even firsthand anecdotal evidence demonstrating that customers were misled.

allegations concerning oral misrepresentations[12] to customers that it believes took place in 2007 and early 2008 that it attributes to Innov-X.  These allegations appear to be based on double or triple hearsay, and for most of them, Niton reports learning from a customer only that a "competitor" allegedly made a statement that Niton "on information and belief" asserts was made by an Innov-X salesperson.  Shein Aff. ¶¶ 31-39.  Niton's affiant, however, does not provide any "information" – only "belief" – that Innov-X was the source of these alleged statements.  These assertions are nothing more than hearsay and innuendo.  They fail to meet even minimal pleading standards, and cannot establish a likelihood of success on Niton's substantive claims.

As Niton notes, it wrote to Innov-X concerning this hodge-podge of allegations in March 2008.  Carroll Dec. Ex. C.  Innov-X requested basic details about the alleged statements: by whom, to whom, when and where they were made.  *Id.* Ex. D.  Niton refused to provide any details.  *Id.* Ex. E.  Even though the allegations were baseless, Innov-X instructed its sales force not to make statements like those Niton alleged had occurred.  Niton did not respond for a year and a half, and then, without notice, filed the present complaint and PI Motion.  Niton is thus also barred by the doctrine of laches from basing its "emergency" PI Motion on these claims.

### c.    The Statements that Niton Identifies Were Not Made by Innov-X.

Niton has not and cannot demonstrate that *Innov-X* made any of the statements upon which it bases its PI Motion.  The PI Motion alleges that three documents contained false or misleading statements, which it asserts were distributed in Asia by JEOL, WellTechtron and WinWinMax.[13]  None of these documents was created or disseminated by Innov-X.

---

[12]    Niton refers to e-mails allegedly received by customers "from Innov-X sales representatives" in 2008, but does not provide copies of those e-mails, or any details concerning the identity of the alleged "Innov-X sales representatives."  Shein Aff. ¶ 34.

[13]    *See* PowerPoint presentation attached to the Yuen Affidavit at Tab A and the Blute Affidavit at Tab B;

JEOL, WellTechtron, and TechMax (which is listed in the footer of the document that Niton attributes to "WinWinMax") are independent companies that have entered non-exclusive distribution agreements with Innov-X pursuant to which they purchase Innov-X products and resell them to Innov-X customers.  Sackett Dec. ¶ 43.  To Innov-X's knowledge, no Innov-X employee was involved in drafting the materials that Niton accuses in its Complaint and PI Motion of violating the Lanham Act, or had ever seen the accused materials prior to Niton's filing of the Complaint and PI Motion.  *Id.* ¶ 51.

Niton does not contend that JEOL, WellTechtron or WinWinMax created or distributed the accused materials at Innov-X's direction or on Innov-X's behalf; it only vaguely alleges that "Innov-X and/or its distributors knowingly made false representations of fact."  Cplt. ¶ 86.  In any event, JEOL, WellTechtron and WinWinMax are not Innov-X's agents[14] and were not acting under Innov-X's control or direction.  Sackett Dec. ¶ 51.

## 2.     Niton Cannot Demonstrate Materiality.

Niton's own allegations demonstrate that the accused statements about the Niton XL3t dose rates were not material.  Even if a statement is literally false, to be actionable the statement must still be material, *i.e.*, affect consumers' purchasing decisions.  *Clorox Co.*, 228 F.3d at 33 n.6.  Niton's own PI papers demonstrate that the customers who received the comparative

---

"Comparison of specifications for compact XRF Analyzers" attached to the Wopperer Affidavit at Tab A and translated at Tab B, also attached to the Blute Affidavit at Tab C; and the "Comparison of Innov-X and Niton" materials attached to the Shein Affidavit at Tab A and also attached to the Blue Affidavit at Tab D.

[14]     Massachusetts courts follow the *Restatement*'s view that the "essential elements of an agency relationship are: 1) the agent's power to alter the legal relationships between the principal and third parties; 2) a fiduciary relationship toward the principal regarding matters within the scope of the agency; and 3) the principal's right to control the agent's conduct in matters within the scope of the agency."  *Sorenson v. H&R Block, Inc.*, 107 Fed. Appx. 227, 231 (1st Cir. 2004).  As detailed above, none of these elements exist in the relationship between Innov-X and its independent distributors, and the contracts between them specifically provide that there is no agency relationship.  Sackett Dec. ¶¶ 43-49; JEOL Agreement Art. 3(1)-(2); WellTechtron Agreement ¶¶ 9, 17; TechMax Agreement ¶¶ 9, 17.

radiation materials still purchased from Niton.[15]  Niton has not demonstrated that it lost a single

sale to a customer who saw the accused materials.  Contrary to Niton's assertion that Innov-X

led an "aggressive marketing strategy" using the comparative radiation statements, supposedly

evidencing Innov-X's belief that the statements were material, the email from Sackett circulating

the PowerPoint shows his belief that customers did *not* pay attention to radiation data.[16]

### 3.    Niton Has Provided No Evidence of Consumer Deception.

Niton presents *no* evidence to demonstrate that it is likely to succeed in demonstrating

that Innov-X made a misrepresentation that actually deceives or has the tendency to deceive a

substantial segment of its audience.  Instead, Niton argues that because Innov-X made "literally

false" statements, "consumer deception is presumed."  PI Mem. 13.  As detailed above, Innov-

X's only relevant statements were true – not "literally false."  "In the absence of such literal

falsity, an additional burden is placed on the plaintiff to. . . show how consumers have *actually

reacted to the challenged advertisement* rather than merely how they could have reacted."

*Clorox Co.*, 228 F.3d at 32 (emphasis added).

### 4.    Niton Cannot Demonstrate Harm from the Accused Statements.

To prevail on a Lanham Act claim, Niton must demonstrate that it has been or is likely to

be injured as a result of the misrepresentation.  Niton has provided no evidence of any harm,

instead arguing that "a showing of actual harm is not required in order for a plaintiff to be

entitled to injunctive relief under the Lanham Act."  PI Mem. at 19 (citing *Camel Hair*).  That is

a misstatement of the law.  *Camel Hair* held that "only a slight likelihood of injury need be

---

[15]      *See* PI Mem. 4 (describing how, despite the distributor's alleged dissemination of allegedly false statements about the XL3t's radiation dose rate, Niton's sales representative "secur[ed] the sale"); PI Motion at 7 (describing how a "customer in Japan which *had recently purchased a Thermo Niton analyzer*" had received the allegedly false statements) (emphasis added).

[16]      Sackett Dec. Ex. B (9/29/08 e-mail) ("nobody ever seems to bother to look up the radiation profiles and think about the ramifications").

shown to warrant injunctive relief *when the defendant's representations were literally false*." *Camel Hair*, 799 F.2d at 15 (emphasis added).  Innov-X has made no literally false statements, and Niton is not entitled to a presumption of harm.

Moreover, Niton's own PI papers demonstrate that the customers who received the comparative radiation materials still purchased from Niton.  Nor can Niton demonstrate that it is likely to be injured in the future by any statement made by Innov-X, because Innov-X instructed its sales staff more than a year ago not to use comparative data from the Original Niton Manual.

## II.    Niton Cannot Demonstrate a Clear Likelihood of Success on Its State Law Claims.

Niton cannot demonstrate a likelihood of success on its state law claims.  Each of its state law claims requires false, deceptive, or improper statements, conduct, or motive or means.  Innov-X made only true statements.  Additionally, with respect to the Chapter 93A claim, the conduct that Niton complains of occurred primarily and substantially in Asia, not Massachusetts.

**M.G.L. c. 93A:**  "[T]he only difference between section 43(a) and chapter 93A, as to false advertising claims, is the *additional element* [under chapter 93A] that the plaintiff must demonstrate that the defendant 'knows or should know' that a statement it has made is false or misleading . . ." *Gillette Co. v. Norelco Cons. Prods. Co.*, 946 F. Supp. 115, 120 n.3 (D. Mass. 1996) (emphasis added).  Niton's Chapter 93A claim falls along with its Lanham Act claim. Niton also cannot succeed on its Chapter 93A claim for the additional reason that the conduct complained of did not occur primarily and substantially in Massachusetts.[17]  Niton alleges unfair or deceptive acts in Asia.  Niton does not allege that any false statements were made in Massachusetts; nor were there any.  The "center of gravity" for Niton's claims is in Asia – not

---

[17]    Chapter 93A, § 11 provides, "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."  M.G.L. c. 93A, § 11.

Massachusetts.  *Korpacz v. Women's Prof'l Football League*, 2006 WL 220762, at *5 (D. Mass. Jan. 27, 2006) ("center of gravity" is where communications forming basis for claim occurred).

**Interference with Business Relationships:** Similarly, to prevail on its claim for interference with business relationships, Niton must demonstrate that Innov-X "intentionally interfered" with Niton's actual or potential advantageous business relationship, using "improper motives or means," and that Niton suffered a loss as a result.  *Dulgarian v. Stone,* 420 Mass. 843, 851-52 (Mass. 1995).  Innov-X simply took Niton's own published numbers and used them in good faith.  Innov-X's motives or means were not improper.  Niton has not even attempted to present evidence that it has suffered a loss.

**Product Disparagement:** To prevail on its product disparagement claim, Niton must prove a false and disparaging statement about its property that caused actual harm.  *Dulgarian,* 420 Mass. at 852.  Innov-X made no false statements; there is no evidence of any harm to Niton.

**Business Defamation:** To prevail on its business defamation claim, Niton must prove that Innov-X knowingly published false or defamatory statements about Niton and that this conduct "discredit[ed] the plaintiff in the minds of any considerable and respectable segment in the community." *Picker Int'l v. Leavitt*, 865 F. Supp. 951, 964 (D. Mass. 1994) (quotation omitted).  "Generally, where the discussion involves a rival's services or product, it is not considered libelous unless it 'imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct.'" *Id.* (quotations omitted).  Niton cannot succeed on these claims.

## III.    Niton Cannot Demonstrate Irreparable Harm Absent an Injunction.

In order to prevail on a motion for preliminary injunction, Niton must demonstrate that it will suffer irreparable harm if the injunction is not issued.  *New Comm. Wireless,* 287 F.3d at 8. Niton has presented *no* evidence of harm, irreparable or otherwise.  Instead, it argues that it is

entitled to a presumption of irreparable harm that applies "if the court concludes that some challenged statement by the defendant is likely to be found 'literally false.'"  PI Mem. 23 (quoting *Gillette Co.*, 946 F. Supp at 120).  Niton cannot rely on a presumption of irreparable harm because Innov-X made no statements that were literally false.

Niton will not suffer any harm, let alone irreparable harm, if its motion for PI is denied, because Innov-X is no longer using the information from the Presentation; nor is it making the statements that Niton believes are damaging.  The First Circuit has repeatedly found no likelihood of irreparable harm where the defendant has ceased the conduct the plaintiff seeks to enjoin.  For example, *American Board of Psychiatry*, although recognizing that harm was presumed because the plaintiff had established likelihood of success on a claim of literal falsity, the court noted that plaintiff still had the burden of proving that defendant was likely to repeat its statements in the future "so as to give rise to an enjoinable threat of irreparable harm."  *Am. Bd. of Psych. & Neur., Inc. v. Johnson-Powell*, 129 F.3d 1, 4 (1st Cir. 1997).  Discussing its earlier decision in *Camel Hair*, the court held:

> One of the *Camel Hair* defendants who had previously sold infringing garments removed them from its racks prior to the preliminary injunction hearing.  Against that defendant, we upheld the district court's denial of an interlocutory injunction, stating that "there was no likelihood of [that particular defendant] causing any injury to [the plaintiff]" at the time the request for an injunction was being considered."

*Id.* (quoting *Camel Hair*, 799 F.2d at 13).  The instant case is even more compelling than *Camel Hair* or *American Board*.  After Innov-X learned that Niton had published a new version of the User Manual, more than a year *before* the filing of the instant litigation, Innov-X instructed employees and requested distributors to stop using the comparative radiation information that relied on the Original Niton Manual.  Sackett Dec. ¶ 34; *id.* Ex. C (11/6/08 e-mail).  After receiving the Complaint and PI Motion in this matter, Innov-X once again instructed its

employees and requested distributors to stop using that information.  Sackett Dec. ¶ 52; *id.* Ex. G
(12/6/09 e-mail).  Since Innov-X has voluntarily stopped using the information that Niton
believes is false, Niton will not suffer irreparable harm – or any harm at all – while awaiting trial.
[18]  Innov-X's "good faith is [also] relevant to the question of whether a preliminary injunction
should issue" as it is a "significant factor to take into account" in determining whether the
defendant is likely to cause harm to the plaintiff in the future.  *Camel Hair,* 799 F.2d at 13.
Here, Innov-X's prompt instruction to its employees to cease relying on data published in the
Original Niton Manual a day after it received the updated XL3t user manual show Innov-X's
good faith and weighs against the entry of a preliminary injunction.

Finally, Niton's delay negates its argument that it is suffering irreparable harm.  Niton
concedes it has had documents that it accuses here since June 2009, Cplt. ¶ 26, but it waited six
months to file its Complaint and PI Motion.  "[D]elay in filing suit rebuts the presumption of
irreparable harm . . . making preliminary injunctive relief inappropriate."  *J. Fritz, DMA, Inc. v.
Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996).

## IV.    The Balance of Harm and Public Interest Favor Denying the Motion.

Niton cannot demonstrate that the balance of harm favors granting a preliminary
injunction.  *New Comm. Wireless*, 287 F.3d at 8-9.  Niton will not suffer any harm if the
injunction is not issued, the balance of harms favors Innov-X.  The injunction apparently seeks to
enjoin conduct of Innov-X's independent distributors as well as its employees, which would

---

[18]     Furthermore, Niton's claim that its goodwill and customer relationships are being harmed rings hollow
where its own papers demonstrate that customers who received the comparative radiation materials still purchased
from Niton.  *See* PI Mem. 4 (despite distributor's alleged dissemination of allegedly false statements about the
XL3t's radiation dose rate, Niton's sales representative "secur[ed] the sale"); *id.* at 7 (describing how a "customer in
Japan which *had recently purchased a Thermo Niton analyzer*" had received the allegedly false statements)
(emphasis added).

create undue burden (and impossibility of compliance with respect to its distributors, which are not agents) for Innov-X.  PI Order (Dkt No. 4, Ex. 1).

Niton's proposed PI seeks to enjoin Innov-X and, apparently, its independent distributors from "making any statement or claim, in any advertisement or promotion, in any form to the effect that . . . Thermo Niton's analyzers expose users to radiation dose rates inconsistent with those reported in Thermo Niton's published literature," or  that "Thermo Niton's analyzers are unsafe, dangerous, and/or expose users to unsafe levels of radiation."  PI Order (Dkt. No. 4, Ex. 1).  Without going to trial and proving that its products are safe or that its published literature accurately reports radiation dose rates, Niton is seeking to enjoin Innov-X from making even *true* statements that call into question the accuracy of Niton's published numbers or the safety of *any* of its analyzers (not just the XL3t on which the allegations of the Complaint and PI Motion are focused).  Such a broad injunction is against the public interest, as honest competition provides a valuable "watchdog" role for the consuming public.[19]  Innov-X takes seriously its duty to educate customers honestly and fairly.[20]  It should be allowed to continue to do this.

Niton's proposed injunction also violates the First Amendment.  While false commercial speech is "clearly 'subject to restraint,'" an injunction that "prohibit[s] future comparative advertising even if it is truthful" goes too far.  *U-Haul,* 793 F.2d at 1042.[21]  Niton's proposed silencing of honest critique is contrary to the public interest and the First Amendment.

## V.    Niton's Unclean Hands Preclude a Preliminary Injunction.

[19]    *See U-Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1042 (9th Cir. 1986) (noting the "informed and reliable decision-making that honest advertising can provide") (internal quotation omitted); *Borden, Inc. v. Kraft, Inc.,* 1984 WL 1458, at *18 (N.D. Ill. Sept. 28, 1984) ("Comparative advertising is to be encouraged because it helps inform the consuming public.").

[20]    *See* Sackett Ex. B (9/29/08 e-mail) ("I have found that nobody ever seems to bother to look up the radiation profiles and think about the ramifications.  It is our duty to show both sets of numbers to prospects. . . .").

[21]    *See also Better Bus. Bureau of Met. Houston, Inc. v. Med. Directors, Inc.,* 681 F.2d 397, 405 (5th Cir. 1982) ("Well-articulated principles delineating the protections to commercial expression" direct that "an initial determination of deception in advertising" do not "warrant an absolute prohibition on all further statements containing reference to the same topic.")

Finally, Niton's PI Motion should be denied because Niton comes to the Court with unclean hands. A preliminary injunction is equitable relief. "It is old hat that a court called upon to do equity should always consider whether the petitioning party has acted in bad faith or with unclean hands." *Texaco Puerto Rico, Inc. v. Dep't of Consumer Aff.*, 60 F.3d 867, 880 (1st Cir. 1995). Niton came to the Court seeking relief on the grounds that "Innov-X brazenly exaggerated the radiation dose rates of Thermo Niton's analyzers by multiplying the published dose rates by one hundred" and that "Innov-X has falsely ascribed the source of these inflated dose rates to Thermo Niton's own User's manual." PI Mem. 13, 21. Niton knew or should have known that these statements, and those like them in the Complaint and PI Motion, were false.

James Blute, in his affidavit in support of Niton's PI Motion states that he is a Health and Safety Manager and Radiation Officer ("RSO"), a position he appears to have held since at least 2004. Blute Aff. ¶ 3.[22] Mr. Blute stated that "[i]n the context of my responsibilities as Health and Safety Manager and RSO for Thermo Niton, I authored Chapter 3 of the Thermo Niton XL3t 800 Analyzer User's Manual." Blute Aff. ¶ 6. Given the substantial similarity between the versions of the manual, the significant change to the numbers in Table 3-7 between versions, the fact that Blute was an RSO for Niton at the time that both versions were created, and the fact that he "authored" Chapter 3 of the manual, it is implausible that he was not aware of the Original Niton Manual and the discrepancy between the numbers listed in Table 3-7 of that manual and Niton Manual 6.5. If Mr. Blute or others at Niton were aware of the Original Niton Manual, as they must have been, many statements in Niton's Complaint, PI Motion, and their affidavits are willfully false and misleading. Niton has come to the Court with unclean hands; its request for the equitable relief of a preliminary injunction should be denied.

---

[22]    Although he does not state what positions he has held at Niton since 2003, an internet search uncovered what appears to be a listserv posting from Mr. Blute from August 16, 2004, in which his signature line indicates that he was the Corporate Radiation Safety Officer for Niton at that time. Carroll Dec. Ex. G.

## CONCLUSION

For the foregoing reasons, Innov-X respectfully requests that Court deny Niton's motion.

Respectfully submitted,

INNOV-X SYSTEMS, INC.,

By its attorneys,

/s/ Robert D. Carroll
Robert D. Carroll (BBO #662736)
rcarroll@goodwinprocter.com
Elianna J. Nuzum (BBO #663354)
enuzum@goodwinprocter.com
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts  02109
Tel.:  617.570.1000
Fax:  617.523.1231

Dated: December 29, 2009

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 29, 2009.

/s/ Robert D. Carroll

LIBA/2052479.7