UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THERMO NITON ANALYZERS LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 09-12053 |
| INNOV-X SYSTEMS, INC., | ) |
| Defendant. | ) |

# FIRST AMENDED COMPLAINT

## Introduction

Plaintiff, Thermo Niton Analyzers LLC ("Thermo Niton"), and defendant, Innov-X Systems, Inc. ("Innov-X"), are competitors in the portable x-ray fluorescence analyzers market. This action arises from Innov-X's deliberate misrepresentations concerning the radiation risks associated with using Thermo Niton's analyzers in an effort to sabotage Thermo Niton's sales, harm Thermo Niton's reputation and increase Innov-X's sales and profits. By this Complaint, Thermo Niton seeks injunctive relief and damages against Innov-X for false advertising and unfair competition under Section 43(a) of the Lanham Act and Massachusetts General Law Chapter 93A, Section 11 (Counts I & II), intentional interference with business relations (Count III), product disparagement (Count IV), and business defamation (Counts V).

In further support of its claims, Thermo Niton states as follows:

## Parties

1. Plaintiff Thermo Niton Analyzers LLC is a limited liability company organized and existing under the laws of Delaware with a principal place of business in Billerica, Massachusetts.

2. Upon information and belief, defendant Innov-X Systems, Inc., is a corporation organized and existing under the laws of Delaware with a principal place of business in Woburn, Massachusetts.

**Jurisdiction and Venue**

3. This Court has jurisdiction pursuant 28 U.S.C. §§ 1331 ("federal question" jurisdiction) and 1367 ("supplemental jurisdiction"), as well as the Lanham Trademark Act of 1946, 15 U.S.C. §§ 1116 & 1121.

4. Pursuant to 28 U.S.C. § 1391(b)(1), the District Court for Massachusetts is the proper venue, because defendant Innov-X resides in Massachusetts and federal question jurisdiction exists.

**Factual Allegations Common to All Counts**

I. **Thermo Niton's Sales of XRF Analyzers.**

5. Thermo Niton is a leading producer of x-ray fluorescence (XRF) analyzers with over 20,000 portable XRF analyzers installed worldwide. Founded more than twenty years ago, Thermo Niton introduced the first one-piece handheld XRF analyzer in 1994.

6. Among their many applications, Thermo Niton XRF analyzers are used for: (a) identification and analysis of metal alloys; (b) RoHS (Restriction of Hazardous Substances) compliance testing; (c) screening for lead in toys, consumer goods, and paint; (d) mineral exploration and mining; (e) environmental site assessment; (f) catalyst recycling; and (g) forensic analysis.

7. In 2008, Thermo Niton sold more than 4,000 portable analyzers, with about a third of those sales to U.S. customers and the remainder abroad.

8. The "retail" price for Thermo Niton's analyzers ranges from $17,000 to $50,000.

9. Thermo Niton's analyzers are designed, developed, assembled, calibrated and quality controlled at its headquarters in Billerica, Massachusetts. In addition to its Massachusetts headquarters, Thermo Niton maintains offices in Munich, Germany and Hong Kong.

10. Thermo Niton sells its analyzers through three different channels: direct sales; Thermo Niton sales representatives; and third-party distributors.

11. As part of its sales efforts, Thermo Niton, its representatives and distributors make presentations about its analyzers to potential purchasers.

12. XRF analyzers, including those manufactured by Thermo Niton, contain an x-ray tube which emits radiation when the tube is on. XRF analyzers identify the components of a sample, such as a metal alloy, by directing a radiation beam at it.

13. When XRF analyzers are used properly, operators rarely receive any measurable dose of radiation. At a maximum, measured doses to XRF analyzer users have not been found to exceed four percent (4%) of the United States annual occupational radiation dose limits.

14. As with any radiation risk, it is prudent to employ due care and take precautions to minimize exposure. Accordingly, the risk of radiation exposure is a significant consideration for potential purchasers of XRF analyzers.

15. Disclosure of radiation dose rates under various operating conditions and appropriate training for safe use of Thermo Niton's analyzers are integral components of Thermo Niton's communications with its customers.

**II.    Innov-X's Sales of Competing Analyzers.**

16. Innov-X was formed in or about 2001 by Donald Sackett, Innov-X's President and a former employee of Thermo Niton's predecessor, Niton Corporation.

17. Innov-X lists offices in Hong Kong, The Netherlands, and Australia on its website in addition to its headquarters in Woburn, Massachusetts.

18. Innov-X competes with Thermo Niton for customers of portable analyzers in the United States and abroad, including in China and Japan.

19. On information and belief, Innov-X has sold nearly 5,000 portable analyzers worldwide, and sold approximately 1,800 analyzers in 2008.

20. On information and belief, Innov-X sells its analyzers via channels similar to that of Thermo Niton: though third-party distributors; direct sales; and sales through Innov-X representatives.

### III. Innov-X's Misrepresentations in Hong Kong about the Safety of Thermo Niton's Analyzers.

21. Innov-X sells its portable analyzers in China and Hong Kong through distributors, including Welltectron Technology Co., Ltd. ("Welltectron"), located in Hong Kong.

22. In or around May of 2009 of this year, Niton Asia Limited ("Niton Asia"), a wholly-owned subsidiary of Thermo Niton, sold one of its analyzers to a customer in Hong Kong called VF Asia.

23. VF Asia had been considering either a Thermo Niton analyzer or an Innov-X analyzer before choosing to purchase a Thermo Niton analyzer.

24. Ronald Yuen, a sales representative for Niton Asia, made a number of sales presentations to VF Asia prior to securing the sale.

25. Innov-X's distributor, Welltectron, made similar efforts to promote Innov-X's analyzers to VF Asia.

26. In June of this year, VF Asia provided copies of Innov-X's marketing materials to Niton Asia to review. The materials included a four-page printout of a "PowerPoint" slide presentation.

27. Each slide of the printout (except the first one) had Innov-X's logo in the top, right-hand corner and the words "Confidential © 2006 Innov-X Systems" in the lower, left-hand corner.

28. The first slide is titled "Radiation Dosage Rates." There are three photos of portable analyzers along the bottom of the chart. The first, the "X-50" is a picture of an Innov-X analyzer. The third photo is of a Thermo Niton analyzer. According to the chart, the Thermo Niton model has a radiation dose rate of seventy (70) mRem/Hr.

29. The radiation dose rate for the Thermo Niton analyzer pictured on the first slide is *one hundred times (100x) higher* than the actual measured and published radiation dose rate for that model (the "Niton XL3t").

30. The second slide is titled "Radiation Profile Data." Under the heading "Information Taken from Competitor's User Manual," is a table titled: "Table 3-7. Secondary (Scatter) Dose Rates (mRem/hr)" that purports to list the radiation dose rate values for various operating conditions when using the Niton XL3t.

31. This table duplicates the "Table 3-7. Secondary (Scatter) Dose Rates (mRem/hr)" contained in the Niton XL3t User's Manual but for one critical distinction: all of the "dose rates" values representing various operating conditions are one hundred times (100x) higher than the actual, measured dose rates that are listed in the Niton XL3t User's Manual.

32. The third slide similarly is titled "Radiation Profile Data." This slide falsely states: "Innov-X has <u>35 times less</u> radiation dose to operator's hand. For 8 hour/day operation, 5

days/week, Xt3 (*sic*) operator dose to hand could reach 8 R in a week, 400 R in a year. **8 times** the annual allowed dose of 50 R/year."

33. The calculations represented on the third slide are based on a radiation dose level for the Niton XL3t that is one hundred times (100x) higher than its actual, published dose rate. Applying the actual, published dose rate for the Niton XL3t (2 mRem/hr for plastic) yields a hypothetical weekly dose rate of 80 mRem/week and an annual dose rate of 4 Rem/year, rather than 8 Rem/week and 400 Rem/year as alleged in the third slide.

34. The fourth slide is titled "Summary of Radiation Safety." This slide outlines five bullet points, the first two of which falsely assert:

> • Testing plastic samples typical in RoHS, Halogen-free or other examples of analyzing low-density samples, the Niton XLt3 (*sic*) delivers a dose of 200 mrem/hour during usage. This is 35 times higher than the Innov-X XRF dose.
>
> • For soil samples typical in environmental analysis, the Niton XLt3 (*sic*) maximum dose is 70 mrem/hr to the operators (*sic*) hand.

35. Again, the fourth slide falsely reports a dose rate of 200 mRem/hour for the Niton XL3t using plastic samples rather than its measured and published dose rate of 2 mRem/hour. As such, the Niton XL3t's dose rate is *three times lower* (.35) than the dose rate of the Innov-X XRF, not "35 times higher" as reported in the fourth slide.

36. The fourth slide also overstates the dose rate for the Niton XL3t by a factor of one hundred (100x) "for soil samples typical in environmental analysis."

37. The fourth slide goes on to state: "When you are considering your health, would you consider any other option?"

38. VF Asia asked Niton Asia whether Innov-X's assertions about the radiation dose rates of Thermo Niton's analyzers contained in the slide presentation were true and whether or not Thermo Niton's analyzers are safe to use.

39. Over the last six months, other potential customers have reported to Mr. Yuen that Innov-X told them that Thermo Niton's analyzers are unsafe.

## IV. Innov-X's Misrepresentations in Japan about the Safety of Thermo Niton's Analyzers.

40. Innov-X sells its portable analyzers in Japan through a distributor called JEOL located in Tokyo.

41. Earlier this year, a customer in Japan who had recently purchased a Thermo Niton XRF analyzer provided documents purporting to compare Thermo Niton analyzers with those manufactured by Innov-X to Thermo Niton's Japanese distributor, Rigaku Corporation ("Rigaku").

42. These comparison charts were given to the customer by Innov-X's agent, JEOL.

43. A Rigaku representative asked Thermo Niton for guidance in responding to the claims made therein in their conversations with customers and potential customers. The Rigaku representative was especially concerned with allegations relating to radiation exposure, as this is an issue of particular sensitivity in Japan.

44. The JEOL documents were written in Japanese and were translated by an independent translation services company located in Cambridge, Massachusetts.

45. The documents contained a number of false comparisons between an Innov-X analyzer and the Niton XL3t.

46. One document titled "Comparison Chart" is a side-by-side series of representations of the various features of the "Hand-held XRF Analyzer" manufactured by "Innov-X Systems, Inc. USA" and imported and sold by "JEOL" and the "Portable component analyzer" manufactured by "Niton Analyzers, USA" and imported and sold by "Rigaku."

47. The last row on page 4 of the chart purports to compare the "Effective dose rate (at trigger position)" of the Innov-X and Niton analyzers. With respect to the radiation dose rate for Niton XL3t analyzer, the translated text states:

> The Niton Analyzers User's Guide states that the XL3t measuring a plastic at 50 kV has an effective dose rate of 20 μSv/h (Table 3-6) and 200 mRem/h (Table 3-7) (= 2 mSv/h) at the trigger point (see B in the above diagram).
>
> If this is true, the effective dose rate in less than one hour surpasses the management limit standard of the Japanese ionizing radiation regulations of 1.3 mSv per 13 weeks (3 months).

48. As describe above, the actual, measured radiation dose rate for plastic reported in "Table 3-7. Secondary (Scatter) Dose Rates (mRem/hr)" of the Niton XL3t User's Manual is 2 mRem/hr, not 200 mRem/hr.

49. JEOL's "Comparison Chart" is literally false and misrepresents that the radiation dose rate for the Niton XL3t is one hundred times higher (100x) than its actual, reported dose rate.

## V. Innov-X's Misrepresentations in Shanghai about the Safety of Thermo Niton's Analyzers.

50. Innov-X sells its portable analyzers in China through a distributor called WinWinMax Electronic Technology Trade Inc. ("WinWinMax") in Shanghai.

51. On or around November 16, 2009, Thermo Niton learned that a prospective customer, Kongsberg Maritime, who is interested in purchasing an analyzer for use in China was provided a pdf file titled "Comparison of Innov-X and Niton XL3T."

52. The pdf file was provided to Kongsberg Maritime by Innov-X's Shanghai distributor, WinWinMax. Kongsberg Maritime asked Thermo Niton's representative for a response to the Innov-X claims contained in the document.

53. The "Comparison of Innov-X and Niton XL3T" pdf document is a five-page chart with the WinWinMax logo printed on the header of each page.

54. The chart is titled "Comparison of Innov-X and Niton" and purports to compare the Innov-X Alpha2000 model with the Niton XL3t model. The various comparisons in the chart contain multiple misrepresentations and literally false statements about the Niton XL3t.

55. The second and third pages of the chart purport to compare the "Radiation Safety" of the Innov-X and Thermo Niton analyzers.

56. WinWinMax's chart falsely reports that Thermo Niton's 50 kV x-ray tube presents a "serious security radiation problem."

57. Thermo Niton's 50 kV x-ray tube does not expose the user to dangerous levels of radiation.

58. As described in the Niton XL3t User's Manual: "Deep, shallow, and extremity exposure from a properly used NITON XL3t analyzer should be less than 200 mrem per year, (2.0 mSv per year) even if the analyzer is used as much as 2,000 hours per year, with the shutter open continuously."

59. 200 mRem per year is four percent (4%) of the maximum allowable occupational radiation exposure in the United States as well as for many other countries.

60. The WinWinMax chart goes on to offer a comparison of the radiation dose rates between the Innov-X model and the Niton XL3t.

61. For the Niton XL3t, the chart reports radiation dose rates of: 160 mRem/hr measured two inches from the side of the analyzer; 12 mRem/hr measured one foot from the side of the analyzer; and 1 mRem/hr at the trigger point. The chart does not identify the sample material that allegedly yields these dose rates.

62. The radiation dose rates reported in the WinWinMax chart far exceed any actual and measured dose rate for the Niton XL3t analyzer.

63. Referring back to the dose rates reported in "Table 3-7. Secondary (Scatter) Dose Rates (mRem/hr)" of the Niton XL3t User's Manual, the dose rates when measuring a stainless steel sample are as follows: 1.6 mRem/hr measured five centimeters (approximately two inches) from the side of the analyzer; 0.12 mRem/hr measured thirty centimeters (approximately one foot) from the side of the analyzer; and 0.01 mRem/hr at the trigger point.

64. WinWinMax's comparison chart, therefore, misrepresents the radiation dose rate for the Niton XL3t by a factor that is one hundred times (100x) higher than its actual, reported dose rate for stainless steel.

## VI. Innov-X's Misrepresentations in 2007 and 2008 about the Safety and Quality of Thermo Niton's Analyzers.

65. In late 2007 and early 2008, Thermo Niton uncovered a number of Innov-X misstatements about the safety and quality of Thermo Niton's analyzers.

66. Thermo Niton learned on August 21, 2007 that an Innov-X salesperson told a representative of the United States Consumer Product Safety Commission that Thermo Niton's 50 kV x-ray tube presented a radiation safety hazard to users.

67. In early October of that same year, the United States Department of Homeland Security (U.S. Customs and Border Protection) declined to follow through on a commitment to purchase several Thermo Niton analyzers based, in part, on a "competitor" claiming that Thermo Niton's 50 kV x-ray tube was dangerous.

68. On or about February 1, 2008, Ergotron, Inc., a potential customer in Minnesota, told a Thermo Niton sales representative that a competitor, who is believed to be Innov-X, had

told the customer that there had been a recall of Thermo Niton analyzers due to a high level of radiation exposure.

69. Around that same time, the Taiwanese environmental protection agency and a corporate customer in the Netherlands reported receiving emails from Innov-X sales representatives stating that Thermo Niton was no longer selling analyzers with 50 kV tubes because of high failure rates and other quality problems.

70. In March of 2008, the United States Environmental Protection Agency, Region 7, informed Thermo Niton that it had received information from a competitor that Thermo Niton's XL3t 600 series units with 50 kV x-ray tubes have been discontinued for safety reasons.

71. At the time, Thermo Niton and Innov-X were competing for a significant order from this agency, and, on information and belief, Innov-X made these misrepresentations in an effort to secure the sale.

72. Thermo Niton was compelled to refute these misstatements to the EPA which clearly had an impact on Region 7's decision-making process. One EPA representative stated after requesting, and receiving, multiple assurances from Thermo Niton that its XL3t 600 series had not been discontinued and was not unsafe: "We're just trying to figure out what's really the truth."

73. Thermo Niton demanded that Innov-X immediately stop making these demonstrably false misrepresentations and to issue any necessary corrections via a cease-and-desist letter dated March 10, 2008.[1]

---

[1] Thermo Niton sent an earlier cease-and-desist letter to Innov-X on July 17, 2007 relating to Innov-X's false advertising claims that: it was the "World's #1 Manufacturer of Handheld XRF"; it was the industry leader with respect to a number of product innovations, and its analyzers had superior detection ability.

74. Negotiations between counsel for Innov-X and Thermo Niton ensued, and Innov-X ultimately claimed it would direct its agents and representatives not to make any statements that Thermo Niton's analyzers were unsafe, no longer being made, or had been recalled.

## VII. Summary of False Claims by Innov-X.

75. Innov-X and its agents, representatives and distributors have made material misrepresentations of fact in advertising and promotion about the radiation dose rates and safety of Thermo Niton's analyzers that are literally false and deceptive to customers and potential customers of Thermo Niton.

76. Innov-X and its agents, representatives and distributors made these misrepresentations in commerce.

77. The misrepresentations described above that were disseminated by Innov-X's agents, representatives, and distributors originated with Innov-X's President, Donald Sackett, and were created in and distributed from Massachusetts.

78. Innov-X authorized its agents, representatives and distributors to disseminate marketing materials containing false information about the radiation risks associated with using Thermo Niton's analyzers to potential customers.

79. The misrepresentations described above are indicative of a pattern on the part of Innov-X of providing false information about the radiation risks associated with using Thermo Niton's analyzers to Innov-X's agents, representatives and distributors for use in their marketing materials to potential customers in an effort to increase sales.

80. The risk of radiation exposure is a significant consideration for potential purchasers of XRF analyzers.

81. The misrepresentations about the radiation dose rates of Thermo Niton analyzers that have been disseminated by Innov-X and its agents, representatives and distributors are likely to influence the purchasing decisions of potential purchasers of XRF analyzers.

82. The misrepresentations overstating the radiation dose rates for Thermo Niton's analyzers such that they were precisely one hundred times (100x) higher than the actual, published dose rates supports a finding that Innov-X disseminated them willfully and in bad faith.

83. Thermo Niton has suffered and is likely to continue to suffer harm as a result of Innov-X's false and misleading statements, including but not limited to lost sales and loss of reputation and goodwill.

**Count I**
(False Advertising and Unfair Competition in Violation of the Lanham Act – 15 U.S.C. § 1125(a))

84. Thermo Niton repeats and realleges Paragraphs 1 through 83 as if fully set forth.

85. Innov-X and its agents, representatives and distributors knowingly have made false representations of fact about the radiation dose levels of Thermo Niton's analyzers in commercial advertising or promotion to customers and potential customers of Thermo Niton.

86. These misrepresentations were made in commerce.

87. These misrepresentations were of a commercial nature and were disseminated with the intent of increasing Innov-X's sales and/or decreasing Thermo Niton's sales.

88. These misrepresentations were objectively false and had a tendency to deceive the actual and potential purchasers of Thermo Niton's analyzers.

89. These misrepresentations were material and influenced the purchasing decisions of actual and potential purchasers of Thermo Niton's analyzers.

90. Thermo Niton has been injured and continues to be injured as a direct result of Innov-X's misconduct in the form of lost sales as well as injury to Thermo Niton's goodwill and reputation with the purchasing public.

91. By making these misrepresentations, Innov-X has violated 15 U.S.C. § 1125(a).

92. Thermo Niton is entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a) to prevent and to remedy Innov-X's misconduct described above.

93. As a result of Innov-X's misconduct, Thermo Niton has suffered damages in an amount to be proven at trial.

94. Innov-X's misconduct was deliberate, willful, and in bad faith, warranting an award of enhanced damages and attorney's fees pursuant to 15 U.S.C. § 1117(a)(3).

### **Count II**
(Unfair Competition and Deceptive Trade Practices – G.L. c. 93A, §§ 2 and 11)

95. Thermo Niton repeats and realleges Paragraphs 1 through 94 as if fully set forth.

96. Thermo Niton and Innov-X are persons engaged in trade or commerce within the meaning of G.L. c. 93A, § 1.

97. By making false representations of fact about the radiation dose levels of Thermo Niton's analyzers, Innov-X has engaged in unfair competition and utilized unfair and deceptive trade practices in violation of G.L. c. 93A, §§ 2 and 11.

98. The actions and transactions described more fully above occurred primarily and substantially within the Commonwealth.

99. Thermo Niton has been injured and continues to be injured as a direct result of Innov-X's misconduct in the form of lost sales as well as injury to Thermo Niton's goodwill and reputation with respect to the purchasing public in an amount to be proven at trial.

100. Thermo Niton is entitled to injunctive relief pursuant to G.L. c. 93A, § 11 to prevent the continuing damage to Thermo Niton caused by Innov-X's misconduct.

101. Thermo Niton is entitled to recover its reasonable attorney's fees and costs against Innov-X pursuant to G.L. c. 93A, § 11.

102. Innov-X's misconduct was willful and deliberate, warranting an award of multiple damages pursuant to G.L. c. 93A, § 11.

## Count III
(Intentional Interference with Business Relations)

103. Thermo Niton repeats and realleges Paragraphs 1 through 102 as if fully set forth.

104. Thermo Niton has advantageous business relationships with its customers and potential customers of which Innov-X and its distributors were aware.

105. Innov-X intentionally and improperly interfered with Thermo Niton's relationships with its customers and potential customers by making false representations of fact about the radiation dose levels of Thermo Niton's analyzers to these customers and potential customers.

106. Innov-X made these unlawful misrepresentations with the intent of increasing Innov-X's sales and decreasing Thermo Niton's sales of its analyzers to these customers and potential customers.

107. Thermo Niton has suffered damages as a direct result of Innov-X's improper and intentional interference with Thermo Niton's relationships with its customers and potential customers in an amount to be proven at trial.

## Count IV
(Product Disparagement)

108. Thermo Niton repeats and realleges Paragraphs 1 through 107 as if fully set forth.

109. Innov-X and its agents, representatives and distributors knowingly have made false representations of fact about the radiation dose levels of Thermo Niton's analyzers to customers and potential customers of Thermo Niton.

110. These misrepresentations were intentionally disseminated by Innov-X in an effort to disparage the quality and safety of Thermo Niton's analyzers to purchasers and potential purchasers of XRF analyzers, thereby increasing Innov-X's sales and decreasing Thermo Niton's sales.

111. Thermo Niton has suffered damages as a direct result of Innov-X's improper and intentional disparagement of Thermo Niton's analyzers in an amount to be proven at trial.

## Count V
(Business Defamation)

112. Thermo Niton repeats and realleges Paragraphs 1 through 111 as if fully set forth.

113. Innov-X and its agents, representatives and distributors knowingly have made materially false representations of fact about the radiation dose levels of Thermo Niton's analyzers to customers and potential customers of Thermo Niton.

114. These misrepresentations have damaged the goodwill and reputation of Thermo Niton with respect to the purchasing public by creating the impression that Thermo Niton is deliberately placing a dangerous and unsafe product in the marketplace.

115. Thermo Niton has suffered damages as a direct result of Innov-X's defamation of Thermo Niton in an amount to be proven at trial.

## Prayer for Relief

WHEREFORE, plaintiff Thermo Niton Analyzers LLC requests judgment as follows:

1. Preliminary and permanent injunctive relief requiring defendant Innov-X and its distributors to cease making the misrepresentations about Thermo Niton's analyzers described herein, to recall all offending materials, and to disseminate corrections and retractions;

2. Compensatory damages to Thermo Niton in an amount to be proven at trial including, but not limited to, actual damages and Innov-X's profits;

3. Multiple damages to Thermo Niton pursuant to 15 U.S.C. § 1117(a)(3) and G.L. c. 93A, §11;

4. Attorney's fees and costs to Thermo Niton;

5. Pre- and post-judgment interest to Thermo Niton; and

6. Such other and further relief as this Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

THERMO NITON ANALYZERS LLC,

By its attorneys,

/s/ Joseph L. Demeo
/s/ Allison Huppé
_____
Joseph L. Demeo (BBO No. 561254)
Allison Huppé (BBO No. 648274)
DEMEO & ASSOCIATES, P.C.
One Lewis Wharf
Boston, MA 02110
Tel: (617) 263-2600
Fax: (617) 263-2300
Email: jdemeo@jdemeo.com
      ahuppe@jdemeo.com

Dated: January 14, 2010

**CERTIFICATE OF SERVICE**

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that there are no non-registered participants.

                /s/ Allison Huppé

                _____
                Allison Huppé